## In re P–R HOLDING CORPORATION.

United States District Court
S. D. New York.
May 19, 1949.

468

Geo. Zolotar, Frederick T. Finnigan, and Kiva Berke, New York City, for securities and Exchange Commission.

Simpson, Thacher & Bartlett, New York City (Hamilton Rickaby, Edward R. Farley, and Benjamin C. Milner, 3rd, New York City, of counsel), for debtor.

Max L. Finkelstein, New York City, trustee.

RIFKIND, District Judge.

Here to be disposed of are the reorganization trustee's account and application for compensation; the application of his accountants for compensation; and the application of the successor trustee for compensation. The Securities and Exchange Commission (S.E.C.) objects to the trustee's account, urging that compensation be denied him and that he be surcharged for infidelity and waste. There is no objection to the accountants' application. Nor is there objection, except as to amount, to the successor trustee's application.

On May 21, 1942, the trustee was appointed in proceedings for the reorganization of the P-R Holding Corporation under Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq. The debtor's principal asset was the Park Royal Hotel, a residential, apartment hotel, located at 23 West 73rd Street, New York City. The trustee managed the Hotel from his appointment until May 16, 1945, when a successor trustee took charge. An acceptable plan of reorganization was effectuated during the trustee's regime.

The S.E.C. alleges that the trustee was negligent or faithless in three respects:

(1) he (a) had meals at the Hotel without paying therefor;

(b) took food out of the Hotel without paying therefor,

(c) occupied rooms at the Hotel without paying any rental,

(d) bought liquor in bottles from the Hotel and paid therefor a price equal to its cost to the Hotel, and

(e) entertained a large party at the Hotel and paid a lesser price than that normally charged;

(2) he negligently or deliberately authorized a great deal of unnecessary painting and decorating; and

(3) he received "kickbacks" from the painting contractor.

All but one, (e), of the first group of allegations are substantiated. In extenuation, it was shown to be the custom at this and other similar hotels to permit the senior officials to eat free of charge and to buy liquor in bottles, at cost, for their personal use. The trustee did both. He should not have accepted meals without paying the price, because, unlike the senior employees, free meals were not part of his agreed compensation. As trustee, he was entitled to no compensation except by court order. Although there is no proof that the trustee bought liquor for profit making purposes, and although he subjected the estate to no loss, he did receive an unauthorized benefit thereby. The evidence of his use of Hotel accommodations shows that on a number of occasions during the summer weeks he returned to New York from the country to attend to the business of the Hotel and on those occasions slept in unrented rooms which were usually furnished with no more than a bed and a chair. However small the charge for such meager accommodations might have been, he should have paid for his room. The amount involved is trivial. It also appears that on occasion his wife would take home leftover cakes and meat scraps for her dog. Least substantial is the complaint regarding the party held by the trustee at the Hotel. Present were 136 persons, for whom the trustee paid the Hotel $2 per person, supplying his own beverages and music. He provided extra compensation for the waiters. The trustee notified the S.E.C. and all other parties to

the reorganization of his intention to hold the party at the Hotel, and none objected. The price charged the trustee was not proved to be too low. While the trustee must now be surcharged for his meals and the liquor purchases, his actions, taken together, display no faithlessness, no injury to the debtor, no material profiting at the debtor's expense. They do, however, suggest the absence in the trustee of that scrupulousness and punctilio in dealing with a cestui's property which should characterize the behavior of trustees. The lower standard observed by this trustee ought to be discouraged; if it stood alone, the form of discouragement might well be a reduction in the trustee's allowance as compensation.

The S.E.C.'s second allegation, (2), is both substantial and, in good part, substantiated. It appears that at the beginning of his tenure, in 1942, his management of the Hotel with respect to painting and decorating was diligent. He abandoned the "cost-plus" system under which painting had theretofore been contracted for by the Hotel and substituted fixed prices for various categories of work, for which he requested bids from several painting contractors. One Reisman, who had been the painting contractor for the Hotel since its erection, was awarded the contract after he agreed to a schedule of prices not appreciably higher than any other submitted. The trustee had had no prior acquaintance with Reisman, and retained him on the advice of the Hotel manager (who, too, had been with the Hotel since its erection, and whom the trustee had retained), because Reisman was familiar with the Hotel and all its workings, so much so, in fact, that he stored his materials there and made free with the office facilities.

About a month after the painting contract with Reisman was made, the trustee began to pay an additional amount on each painting bill submitted, at the rate of 7½% of the contract price. It appears that Reisman demanded an increase of 15% on account of claimed increased costs of labor and material and, after negotiation this was reduced to 7½%. The trustee made no real investigation of Reisman's claims of increased costs, nor did he obtain bids

from other painting contractors. The charitable explanation of these failures is that he trusted Reisman and thought the Hotel would benefit from a continuation of the services of a painting contractor who was thoroughly familiar with the premises and with many of the tenants. The trustee did check with apparent care the painting charges billed to the Hotel against the schedule of charges agreed to by Reisman and made numerous corrections to the advantage of the Hotel. His discovery of numerous discrepancies casts doubt upon his discretion in continuing to rely upon the good faith and honesty of Reisman.

The trustee retained Reisman as painting contractor for the year 1943 and thereafter. He accepted Reisman's schedule of prices for 1943 (the same schedule remained in effect until 1945, when the trustee was replaced) without seeking competitive bids, although Reisman's prices for 1943 were considerably higher than for 1942; e. g., in 1942, a living room ceiling was $9, in 1943, $12; foyer woodwork was $7 in 1942, $11 in 1943; a one room apartment, painted with one coat of paint, was $36 in 1942 and $45 in 1943; a four room apartment was $154 in 1942 and $190 in 1943. In September of 1943, the trustee authorized a payment to Reisman of $662, which Reisman represented to be the amount of retroactive wage increases he had been required to pay by the wartime Wage Stabilization Board, with respect to which increases the trustee had theretofore agreed to make an adjustment. In fact Reisman's very inadequate records tend to show that the amount of the wage increase was about $200 less, but the trustee did not know this. His mistake was to trust Reisman.

A detailed statistical analysis of the painting work done by Reisman at the Hotel during the trustee's tenure, and during the years preceding his tenure, establishes that during 1938 and 1939, the total expenditure on painting for all apartments did not exceed $17,000 per year, while during the trustee's tenure the ordinary expenditures for apartment painting exceeded $28,000 in 1943 and $23,000 in 1944. No comparison with 1940 and 1941 is possible because the figures for these years are in-

complete. In 1938, less than $4000 was spent on "house work," that is, painting and decorating in the public portions of the Hotel. In 1939, less than $1000 was so spent. But in 1943, over $11,000 was spent on "house work," and in 1944, between $3000 and $4500 was so spent.

The following tables are illuminating:

(All cost figures are to the nearest dollar).

Table I.

| | No. of Apts. completely painted, including those where extra work was done | Average cost | No. of Apts. partially painted | Average cost |
|---|---|---|---|---|
| 1938 | 101 | $136 | 79 | $59 |
| 1939 | 87 | $158 | 74 | $48 |
| 1942 | 63 | $244 | 94 | $81 |
| 1943 | 128 | $238 | 49 | $91 |
| 1944 | 56 | $127 | 132 | $123 |

Table II.

| | Total No. of Apts. in which any painting was done | Average Expenditure per Apt. |
|---|---|---|
| 1938 | 180 | $93 |
| 1939 | 161 | $97 |
| 1942 | 157 | $96 |
| 1943 | 177 | $160 |
| 1944 | 188 | $126 |

It does not appear that, in any one year under the trustee's administration, many more apartments were refurbished in whole or part than was customary in pre-war years. Much of the alleged duplication of work on specific apartments consisted of partial wallpapering, for which the Hotel was separately billed. Reisman appears to have made little or no price adjustment for complete paint jobs in apartments where some wallpapering (usually very little) was done by him simultaneously, or shortly after painting. There is no convincing proof, however, that where a small portion of an apartment is to be wallpapered, the cost of completely painting the remainder is appreciably reduced thereby.

It does appear from Table II that in 1943 $65, or about 68% more was spent, on the average, on each apartment on which work was done than during the prior years

and in 1944 about $31, or 33% more was so spent. These percentages are calculated without taking into account the blanket price adjustments on alleged increased costs and wage scale revisions which the trustee gave to Reisman. Were those increases to be considered, the percentages of increase would be augmented.

In 1938, of 101 apartments completely painted, only 29 were given 2 coats; in 1939, of 87 apartments completely painted, only 25 were given two coats, and 3 were given three coats; in 1943, however, of 128 completely painted, 111 were given two coats and 1 was given three coats; in 1944, of 56 completely painted, 32 were given two coats and 61 additional apartments, though not completely painted, were refurbished at a cost in excess of that charged for 61 complete two coat paint jobs. The conclusion is inescapable that the trustee authorized a great deal more work to be done, and money to be spent, in painting and decorating apartments than was customary theretofore. Furthermore, most apartments were, under the trustee's administration, completely or partially painted for three years in succession, in 1942, 1943 and 1944. In the light of the almost total occupancy of the Hotel during most of this period, attributable to war conditions and a high pre-existing tenancy

rate, such lavish maintenance of the premises was most injudicious. The fact that the Office of Price Administration, which became active in the housing field in 1943, required that residential apartments be painted but once in three years to relieve the owners of liability for reduction of customary services, reinforces this conclusion. The excuse of reliance upon carefully selected subordinates is not available to the trustee because he undertook close control of the operation of the Hotel, directed the payment of painting bills after "personally" checking them and accepted Reisman's 1943 price schedule without securing other bids or making an independent investigation.

The second major charge of the S.E.C. has been established to the extent that it accused the trustee of negligent management.

That the trustee was also guilty of malfeasance, that he deliberately and purposefully wasted the Hotel's assets in unnecessary painting and received "kickbacks" from Reisman, is the gravest charge leveled against him. It is of course not established merely by the evidence of his negligence. Additional evidence was offered by the S.E.C. to prove its charge of malfeasance. First, it offered two checks drawn by Reisman to the order of cash. The first, dated December 10, 1942, for $50, is unendorsed, but upon its reverse side appears the notation, in Reisman's handwriting, "Finkelstein for comition (sic) for job at 23 W. 73d St." The second check, dated February 18th, 1943, for $100, is indorsed by the debtor and bears on its reverse the notation, also in Reisman's handwriting, "Comition (sic) to Fi acc of H——" (word illegible). Also offered was a notation, presumably made by Reisman, on an adding machine tape found with his books of account, which suggests that 10% of his gross income from work at the Hotel was allocated to "commissions." Further, the trustee admitted borrowing, on two occasions, several hundred dollars from Reisman, all of which, however, he claims to have repaid, and most of which, documentary evidence proves, he did repay. I believe he did repay it all. The impropriety of such borrowing is too clear to require elucidation. Finally, Reisman did some painting of premises privately owned by the trustee, for which he was paid by the trustee out of the trustee's personal funds. The trustee has testified that he never saw the accusing checks before the trial of this matter, nor ever received any part of their proceeds; that he never received any monies from Reisman as gifts or commissions or otherwise. Reisman testified that he made the notations on the checks to establish fictitious business expenses "for tax purposes." This witness, Reisman, impressed me as being utterly unworthy of belief. Nevertheless his explanation is quite in keeping with his character and, for that reason, might well be true. It is impossible to conclude from the evidence recited, even taken together with the established excessive painting, that it is more probable than not that the trustee received "kickbacks" from Reisman, or deliberately authorized payment for more painting than he honestly, albeit negligently, thought was proper. Of malfeasance he must be acquitted.

The trustee asks for an allowance of $22,500. For his services in operating the Hotel he deserves no compensation. His management was negligent and inefficient. He abused his position of trust to obtain free food and lodging, and to obtain liquor at an advantageous price. Finally, his relations with Reisman were such as to impair his ability to act solely in the interests of the debtor.

He must be surcharged $904.85, the aggregate price for the meals he ate but did not pay for. The trustee challenges the accuracy of the amount, but he cannot complain if his own records are faulty. For the liquor he must be surcharged the difference between the wholesale price, which he paid, and the retail price. He paid $1052. On the argument counsel suggested that 33⅓% represented the normal whole-sale-retail price differential. The trustee will, therefore, be charged $350.67, unless either party desires to present more specific proof of the item.

The trustee did devote considerable efforts to the formulation of an acceptable plan of reorganization. Since he has not been found to be guilty of malfeasance in

connection with his other duties, it seems just to allow him a reasonable compensation for his services in connection with the reorganization plan. The trustee's account is therefore approved, except that he is surcharged $1255.52 which may be deducted from his compensation. He is awarded an allowance of $4,000 for his services as trustee.

The accountant's application for $720 for services rendered is approved.

The successor trustee, who has already been allowed $500 in part payment, is allowed the further sum of $1000 as a final allowance for his services.